# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Adams County Parcel Number: 0171917406011,<br>more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)    Case No. 20-sw-689-GPG |

## APPLICATION FOR A SEARCH WARRANT

I, Kevin Doheny, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the <u>State and</u>  District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. §§ 841 & 846 | Distribution of Fentanyl |
| Title 18 U.S.C. §§ 922(g) & 924(c) | Firearms Offenses |

The application is based on these facts:

X   Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Kevin M. Doheny*

<u>SA Kevin M. Doheny, DEA</u>
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:    6/10/20

City and state:   <u>Grand Junction,</u>

*Judge's signature*

Gordon P. Gallagher, USMJ

*Printed name and title*

**ATTACHMENT A**
**Description of Location to be Searched**

Adams County Parcel Number:  0171917406011 with an address of 2524 W 100th Avenue, Federal Heights, CO 80260.

Description of Area: A parcel of land identified in Adams County Assessor records as Parcel Number: 0171917406011, Address of 2524 W 100th Avenue, Federal Heights, CO 80260 and owned by Lee Liu Sha. The location is on the south side of W 100th Avenue and the house is two toned in color; the upper is cream, with red trim, and red brick.  The side of the house has vinyl siding. The roof is dark asphalt shingles. The attached garage is on the west side of the house and the numbers 2524 are in red between the garage and brick of the house.

The search will include all persons, all rooms, attics, basements, and all other parts of the property, as well as surrounding grounds, garages, vehicles, storage rooms, or outbuildings of any kind, attached or unattached, located thereon and under the dominion and control of the occupants, namely Victor Ortega-Ochoa and Lidia Chavez-Ortiz, of 2524 W 100th Avenue, Federal Heights, CO.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and Title 18, United States Code, Sections 922(g) and 924(c), to include:

1. Controlled substances, including fentanyl pills or any other pills that have the appearance of 30mg Oxycodone pills.

2. Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

3. Any substance used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

4. Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, narcotics customer lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances..

5. Indicia related to occupancy, residency and or ownership of property, premises, or vehicles.

6. Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms and ammunition.

7. Financial records, including expenses incurred in obtaining the equipment and items necessary for the cultivation and/or distribution of controlled substances, income derived from the sales of controlled substances, pay-owe sheets, records of legitimate income (to serve as a baseline to discern excess or unexplained income consistent with proceeds derived from drug trafficking) and general living expenses.

8. Passports, travel documents, and other records indicating travel to or from Mexico from February 2019 to present.

9. Concealed and/or aftermarket compartments in vehicles present at the Target Location, which may be used to import or transport controlled substances.

10. United States currency, precious metals, jewelry and financial instruments, including mortgage notes, stocks, and/or bonds representing drug proceeds.

11. Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit

1

keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

12. Computers, cellular telephones and/or portable telephones, pagers, iPods, and similar devices, including any electronic data stored or saved therein.

13. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled substances.

14. Devices used to communicate with other individuals involved in the manufacture and distribution of controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

15. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

16. Devices, equipment and maps used to identify and/or mark potential sites and for land navigation, to include both tangible media and electronic media, such as GPS devices, maps, charts, drawings and written directions or instructions related to areas suspected of containing fentanyl distribution operations.

17. Assigned telephone number for any and all telephone, cell phones and pagers found in the area, along with telephone toll records, papers, notebooks and other items documenting the purchase, acquisition or distribution of marijuana or any other controlled substance, and communications among co-conspirators.

18. For the electronic devices (hereinafter COMPUTERS):

    a. evidence of who used, owned, or controlled the COMPUTERS such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

2

e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

f.   evidence of the times the COMPUTERS was used;

g.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

h.   contextual information necessary to understand the evidence described in this attachment;

i.   volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

j.   Records and information, including texts, emails, photographs, or videos of or about controlled substances or firearms, or people possessing, obtaining, distributing, or using controlled substances or holding firearms;

k.   any and all information, notes, documents, records, or correspondence, in any format and medium, pertaining to violations of 21 U.S.C §§ 841 and 18 U.S.C. § 1956.

l.   items otherwise described in this attachment but contained on an electronic device of any sort.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Kevin Doheny, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

## PURPOSE OF THIS AFFIDAVIT

1.      This affidavit is submitted in support of a search and seizure warrant for private property located in Adams County, State of Colorado.  Based on my training, experience, and interactions with other law enforcement officers, there is probable cause to believe that evidence relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 924(c), will be found at or near the following location in Adams County, Colorado:

a.  Location description: Adams County Parcel Number: 0171917406011 with an address of 2524 W 100th Avenue, Federal Heights, CO 80260. The location is described in more detail in Attachment A.

2.      The facts set forth in this affidavit are based on my direct participation in the investigation, personal observations, observations of other officers named herein, training and experience and information obtained from other witnesses and Law Enforcement Officers, including their incident reports.  This affidavit is intended to show that there is sufficient probable cause to search the locations identified herein and described more fully in Attachment A, incorporated herein by reference, and seize the items of evidence described herein and described in Attachment B, incorporated herein by reference, and does not purport to set forth all of my knowledge of, or the investigation into, this matter.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary and applicable to establish the appropriate foundation of probable cause for the issuance of a search

warrant.  I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

## INTRODUCTION AND AGENT BACKGROUND

3.      I, Kevin Doheny, am a Special Agent (SA) with the DEA, United States Department of Justice, and as such I am empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants.  I have been employed as a DEA SA since 2017, with seven years of prior law enforcement experience with the Panama City Police Department, Panama City, FL. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances.  During my time with the DEA, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code.  I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

4.      Based on my training and experience, I know that it is generally a common practice for people who traffic in large amounts of controlled substances to keep records, proceeds from drug transactions, and other evidence.  I know that records, in particular, are often maintained by drug traffickers.  These records include pay-owe sheets or notations.  Evidence of such records are typically maintained and found within the premises owned or controlled by the drug trafficker, upon their persons, or within vehicles they use, and are of evidentiary value.

5.      Based on my training and experience, I know that persons who distribute drugs use miscellaneous written documents such as published books and magazines concerning drug manufacturing and sales, written records concerning the perpetrator's distribution activities, account ledgers dealing with profits and losses associated with distributing drugs, distribution schedules, documents concerning profitability, and other such documents and written records.  These written records and documents are normally discovered during the execution of a search warrant at the residence or location, the premises owned or controlled by the distributor, upon their persons, or within vehicles they use, and are of evidentiary value.  I also know that traffickers often use wire transfers, cashier's checks, and money orders to pay for controlled substances or transfer proceeds. Evidence of such financial transactions and records relating to income and expenditures in connection with drug trafficking are typically maintained and found upon the premises owned or controlled by the traffickers, upon their persons, or within vehicles they use, and are of evidentiary value.  During investigations of drug distribution to include but not limited to methamphetamine, marijuana, cocaine, and heroin, agents have found written documents, including, but not limited to, pay-owe sheets, lists of phone numbers (including numbers of potential co-conspirators), records of drug distribution, lists of associates (including names of potential co-conspirators), and identification documents such as driver's licenses, state identification cards, credit cards, school identification, social security cards, and voter registration cards.

6.      Based on my training and experience, I know drug traffickers typically possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might want to forcibly take the traffickers' profits and/or supply of drugs.

7.      Based on my training and experience, I know that drug traffickers seeking to avoid detection of their illegal narcotics, weapons, and/or large amounts of currency, frequently hide these

items in their residences, garages, storage buildings, unused recreational vehicles, travel trailers, or other unused vehicles parked on their property or at their residences and in, under, or behind camping equipment, yard furniture, buildings, plants, trees, rocks, trash containers, and other items located within or near their residences.

8.     My awareness of these drug trafficking practices, as well as my knowledge of drug manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:

    a.   my training in controlled substance investigations;

    b.   my past experience in the investigation of drug distribution organization operations;

    c.   the experience of other officers and agents who have trained and advised me; and

    d.   other information provided through law enforcement channels such as databases.

## **PROBABLE CAUSE**

9.     On December 28, 2017, an individual, identified herein as J.E., died from a fentanyl overdose in Carbondale, Colorado.  On the same date, an individual, identified herein as Z.G., survived a fentanyl related overdose.  Arising from this incident, the DEA Grand Junction Resident Office (GJRO), DEA Glenwood Springs Post of Duty (GSPOD), and the Western Colorado Drug Task Force (WCDTF) began jointly investigating a Drug Trafficking Organization (DTO) responsible for the importation of counterfeit trademark opiate oxycodone pills that contain fentanyl from Mexico into Colorado.

10.    To date, agents have been able to identify as many as ten overdose deaths related to fentanyl in Mesa and Garfield Counties of Colorado possibly related to this DTO over a two year period.  This investigation identified Bruce Holder as the principal source of supply for counterfeit trademark opiate oxycodone pills, which actually contain fentanyl, entering into the Grand Junction, Colorado area.  On August 16, 2018, Holder was indicted and subsequently

arrested.  A search of Holder's phone, pursuant to a search warrant, revealed substantial contacts with a source of supply in Mexico, initially identified as "Chon."

11.    As part of the investigation, agented developed a DEA confidential source ("CS").  Over the course of the investigation, agents from DEA conducted debriefs of the CS, who is still working with law enforcement regarding this investigation.  The CS contacted law enforcement after Holder's arrest to explain the CS's knowledge of Holder and Holder's associates.  The CS has known Holder for approximately 20 years and had purchased pills from Holder.  The CS has a criminal history in Colorado and Utah.  In 2006, the CS pled guilty to conspiracy to distribute cocaine, conspiracy to distribute methamphetamine, along with other charges, and was sentenced to prison.  The most recent item on the criminal history report was from January 2008, which was a probation violation.  The CS has not received any new charges since and has steady employment.  Agents report that the CS has never knowingly provided information related to the drug trafficking activities of Holder and/or his associates that has proven to be false.  Agents have been able to corroborate some of the information obtained from the CS, adding to the CS's credibility.

12.    At the direction of agents, the CS spoke with Holder's significant other, Marie Matos.  Matos told the CS that she had nine pounds of methamphetamine stashed in Grand Junction, CO.  Matos asked the CS to help her sell the methamphetamine and Matos also provided the CS's phone number to her source of supply, whom she referred to as "Chon" or "Raul".

13.    In November 2018, the source of supply, who identified himself as "Sean Penn", contacted the CS.  It is believed that aliases "Chon", "Raul", and "Sean Penn" refer to the same

person.  The source of supply told the CS that he could arrange the delivery of drugs to Grand

Junction, CO.   Thereafter, the CS made several controlled purchases at the direction of agents.

14.      In February 2019, the source of supply contacted the CS.  The source of supply

told the CS that he had drugs in Denver, CO, that the CS could pick up.  The CS and the source

of supply reached an agreement for $12,000 in exchange for 1,000 counterfeit trademark opiate

fentanyl pills.

15.      Based on phone conversations between the CS and the source of supply, a

controlled purchase was set up to take place at a mall in Lakewood, CO.  The CS met with

agents prior to the controlled purchase.  Agents searched the CS and his/her vehicle for currency

and contraband; none was found.  The CS was provided with $12,000 in prerecorded controlled

purchase funds and outfitted with recording and monitoring equipment.  Surveillance was

maintained on the CS throughout the controlled purchase operation.  The CS did not meet with

anyone or stop anywhere on the way to or from the controlled purchase.

16.      The source of supply called the CS during preparations for the controlled

purchase.  The source of supply indicated that the individual delivering the pills was on his way

to the controlled purchase location.  The source of supply asked where the CS was; the CS

explained that he/she was on the way to the mall.  The CS then departed for the controlled

purchase location.  On the way, the recording equipment malfunctioned and did not record the

encounter.  Nevertheless, surveillance was maintained throughout.

17.      While enroute, the source of supply called the CS and changed the controlled

purchase location, directing the CS to a Target store and demanded that the CS stay on the phone

during the purchase.  Surveillance followed the CS to this location; the CS did not stop anywhere

on the way.  A short time after arriving at the new location, the CS parked next to a white

vehicle.  A male, later identified as Victor Ortega-Ochoa, exited the car and approached the CS.

Ortega-Ochoa handed the CS a Wendy's food bag containing a vacuum sealed bag with pills.

The CS gave Ortega-Ochoa the $12,000 in controlled purchase funds in exchange.  Ortega-

Ochoa then returned to the car and departed.  A female, later identified as Lidia Chavez-Ortiz

was with Ortega-Ochoa.  Surveillance followed them to a location 2524 W 100th Ave, Federal

Heights, Colorado (TARGET LOCATION).

18.     The CS departed from the controlled purchase location shortly after Ortega-Ochoa

left and drove to a predetermined neutral location.  Once there the CS gave me the Wendy's bag

with pills.  I notice that the light blue/green pills were imprinted with an "M" on one side and a

"30" on the other side.  These pills were consistent in appears with many other pills purchased

and seized throughout this investigation, all of which lab testing has shown contained fentanyl or

a fentanyl analog.  The CS and his/her vehicle was again searched for currency and contraband;

none was found.  Agents then debriefed the CS.

19.     The CS explained that Ortega-Ochoa was getting suspicious while waiting, which

is why the CS had to stay on the phone with the source of supply.  The CS said the drug deal was

extremely fast, but he was able to clearly see Ortega-Ochoa (whom the CS later identified from

photographs).  The CS explained that the source of supply called after the drug deal and

explained that everything was good.  The source of supply told the CS that there were 2,000 pills

instead of 1,000 pills.  They agreed to talk later about future plans.

20.     The pills distributed by Ortega-Ochoa were later submitted for laboratory

analysis.  There were 1994 pills with a net weight of 214.6 grams.  Laboratory analysis shows

the pills contained a mixture of fentanyl and acetaminophen.

21.     In May 2019, the CS spoke with the source of supply about making a partial payment for previously purchased fentanyl pills.  On May 16, 2019, the CS arranged for the partial payment of the additional 1,000 pills obtained from Victor Ortega-Ochoa in the Denver, Colorado, area on February 13, 2019.  The CS advised he/she was supposed to meet Ortega-Ochoa in the area of Mesa Mall, located at 2424 Highway 6&50, in Grand Junction.  The CS maintained contact with the source of supply leading up to meeting with Ortega-Ochoa.  The CS met with Ortega-Ochoa and provided him with $4,000 in official funds.  Mobile surveillance continued to follow Ortega-Ochoa, who was in the same white vehicle he was in during the controlled purchase on February 13, 2019.  When Ortega-Ochoa reached the area of Rifle, Colorado, a Colorado State Patrol Trooper stopped him for a traffic violation.  The trooper was able to identify the driver (who was the same individual I recognized from the controlled purchase on February 13, 2019) as Victor Ortega-Ochoa and the passenger as Lidia Chavez-Ortiz.

22.     In June 2020, I obtained a federal arrest warrant for Ortega-Ochoa for distribution of fentanyl.  On June 10, 2020, at approximately 08:00 am, Deputy United States Marshals (DUSM) with the US Marshals Service (USMS) out of the Denver office, Senior Inspector Joshua Clesi, and SAs with DEA out of the Denver Field Division conducted static surveillance at the suspected residence at 2524 W 100th Avenue, Federal Heights, CO (TARGET LOCATION).

23.     At approximately 09:30 pm, SI Clesi observed a Hispanic male matching Ortega-Ochoa's description stick his head out of the front door of the residence to see another younger male leave the residence.

24.     At approximately 1:22 pm, officers with Federal Heights PD, DUSMs, and DEA SAs attempted to contact Victor Manuel Ortega-Ochoa.  Upon knocking, SI Clesi contacted Lidia Chavez-Ortiz, Juan Chavez, her father, and 2 young males.  Chavez-Ortiz stated that Ortega-Ochoa was upstairs in the home with their 2 month old child.  The entry team entered and cleared the residence.  Ortega-Ochoa was arrested in the master bedroom in the rear of the home.  Inside of this bedroom, officers noticed a tan AR-15 style rifle that had an orange tip and that there was also a rifle case under the bed.

25.     SI Clesi spoke with Chavez-Ortiz, who is a Spanish speaker, and attempted to receive consent to search the bedroom based on the items in plain view.  SI Clesi was unable to properly explain this in Spanish and requested a Spanish speaker on-scene.

26.     Maria Chavez with the Federal Heights PD is a native Spanish speaker and volunteered to speak with Lidia Chavez-Ortiz.  Maria requested consent from Chavez-Ortiz to search the bedroom to ensure that there were no weapons.  Chavez-Ortiz requested to see a warrant, and agents provided her the arrest warrant for Ortega-Ochoa.  Maria further explained that the arrest warrant was only for Ortega-Ochoa; authorities were seeking further consent to search the master bedroom because there were some firearms related items in the room.  Chavez-Ortiz gave consent to search the room.

27.     SI Clesi and SA Shannon Moham discovered that the tan AR-15 style weapon was a BB gun.  The rifle case under the bed had the Bushmaster brand logo on it, but was empty.  A cursory search of the top drawer of the dresser on the right side of the bed produced a pistol magazine loaded with 9mm ammunition.  At this point, SI Clesi decided to stop the search and seek a search warrant.

28.     SI Clesi spoke to Victor Ortega-Ochoa before he was transported to the Denver County jail.  SI Clesi read Ortega-Ochoa his Miranda Rights in the Spanish language directly from a Miranda Rights Advisement card.  Ortega-Ochoa agreed to speak with SI Clesi.  SI Clesi explained that a 9mm magazine was found near his bed.  Ortega-Ochoa stated that he only had 1 firearm in the house, a 9mm pistol in the bed.  SI Clesi asked if there was any bulk U.S. currency or narcotics in the residence.  Ortega-Ochoa claimed there were none.

29.     A criminal history search revealed Victor Ortega-Ochoa is a citizen of Mexico and is in the United States illegally.  In 2009, Ortega-Ochoa was arrested by Customs and Border Protection for entry without inspection, which resulted in a 5 day jail sentence.  Agents have not been able to locate any documents that show Ortega-Ochoa has obtained US citizenship.  During the traffic stop in May 2019, Ortega-Ochoa identified himself by a Mexico identification card and a Mexico passport.  Accordingly, Ortega-Ochoa's possession of the firearm would be in violation of the law.

## SEIZURE AND SEARCH OF ELECTRONIC DEVICES

30.     In this affidavit, the terms computers, or digital storage media or devices are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical storage media.

31.     I submit that if computers or storage media are found at the areas described above and in Attachment B, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data

that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  I am aware that modern cellular telephones, or smart phones, operate in many respects as a computer, with internet access, and function at times as a person's computer historically would have.

32.     Based on my and my colleagues' knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.   Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

33.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

34.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

35.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

36.     The analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for

evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

37.    "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at the location described in Attachment A.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38.    I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the locations.

39.    Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly

likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

40.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b.   The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.  Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items

sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachment A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

41.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

42.     Because several people may share the area described in this affidavit, it is possible that the area will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the

things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

43.     I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

## **CONCLUSION**

44.     Based on the foregoing facts and information, my training and experience, and through discussions with other investigators, I believe there is probable cause to find that the locations described in Attachment A, attached hereto and incorporated herein by reference, will contain the items set forth in Attachment B, and probable cause exists to search the locations described in Attachment A for the items described in Attachment B.  These items constitute evidence of the commission of criminal offenses and are contraband, fruits of the crime, things otherwise criminally possessed, and property designed or intended for use, or that is or has been used, as the means of committing the criminal offenses of Title 21, United States Code, Sections 841(a)(1) (distribution of fentanyl), and 846 (conspiracy), and Title 18, United States Code, Sections 922(g) (possession of a firearm by a prohibited person) and 924(c) (possession or use of a firearm in relation or in furtherance of a drug trafficking offense).

I, Kevin Doheny, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

s/ *Kevin M. Doheny*
Kevin M. Doheny
Special Agent
Drug Enforcement Administration

Subscribed, attested to, and acknowledged by reliable electronic means on June 10, 2020.

GORDON P. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

Affidavit was reviewed and is submitted by AUSA Jeremy Chaffin on June 10, 2020.